UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

AMANDA HAWKINS, ET          :
AL.,                        :
                            :
      PLAINTIFFS,           :
                            :
vs.                         : CASE NO. 2:05-CV-688
                            :
ANHEUSER-BUSCH, INC.,       :
                            :
      DEFENDANT.            :

- - -

Deposition of **AMANDA MICHELLE GRACE-HAWKINS**, a Plaintiff herein, called by the Defendant for cross-examination under the applicable Federal Rules of Civil Procedure, taken before Sylvia A. Fraley, a Registered Diplomate Reporter, Certified Realtime Reporter and Notary Public in and for the State of Ohio, pursuant to notice at the Offices of Vorys, Sater, Seymour & Pease, 52 East Gay Street, Columbus, Ohio commencing on Tuesday, May 30, 2006 at 9:15 a.m.

- - -


**Fraley Cooper & associates**
Professional Court Reporters

Newark, Ohio
(740) 345-8556

Main Office
8036 Smoke Road
Pataskala, Ohio 43062
(740) 927-3338
(800) 852-6163
Fax (740) 927-3436
e-mail: FraleyCooper@earthlink.net

Columbus, Ohio
(614) 228-0018

1    Anheuser-Busch?

2        A.   She's retired. -- Well, she will be soon, I

3    believe.  She's -- I think she's taking her last couple

4    weeks of vacation.  After that, it goes into

5    retirement.

6        Q.   Okay.  And how did you know Glenda?

7        A.   Just a mutual friend.

8        Q.   You were hired as a weekender on November 4,

9    1996?

10       A.   (Affirmative nodding of head.)  I believe so,

11   yes.  I know it was '96.

12       Q.   And what shift -- I know you were working

13   weekends, but what shift on the weekends were you

14   working?

15       A.   You could -- any shift.  I mean, it just

16   varied.  When they needed you.

17       Q.   And what were you doing?

18       A.   A lot of cleaning.  Initially, when I

19   started, I ran the filler, I believe, the filler on

20   Line 70.

21       Q.   You were paid by the hour?

22       A.   Yes.

23       Q.   Do you remember that you were paid $20.99 an

24   hour?

25       A.   I know it was about $20, yes.

1       Q.    How many hours did you average a week?

2       A.    Sometimes eight, sometimes 16.   It just

3   varied.   Like I said, it depended on how much help they

4   needed.

5       Q.    Did you have a supervisor at the time?

6       A.    Foremens, yes.

7       Q.    Who was your foreman when you first started?

8       A.    When I first started?

9       Q.    Yes.

10      A.    We worked for a lot of foremens.   Each

11  weekend, it could be a different foreman.

12      Q.    Okay.

13      A.    One in particular, his last name was Stevens.

14  He retired, though.

15      Q.    Did you become a member of the union when you

16  started as weekend relief?

17      A.    Yes.

18      Q.    And the union is Teamsters Local 284; is that

19  right?

20      A.    Yes, I believe so.

21      Q.    And when were you hired on full-time?

22      A.    It was -- Let's see.  Maybe 2000.  Something

23  like that.  '99, 2000.  Somewhere around there.

24      Q.    So between 1996 and '99 or 2000, you were a

25  weekend relief the entire time?

1      Q.   Have you ever filed a grievance using the

2  grievance procedure?

3      A.   No.

4      Q.   However, you have been aware that you could

5  ask the union to file a grievance on your behalf if you

6  want to?

7      A.   Yes.

8      Q.   Would you agree or disagree that the union

9  was there to protect the rights of the employees, of

10  its members?

11      A.   When?  When are you referring to?

12      Q.   During your employment with Anheuser-Busch?

13      A.   I guess.  I don't know.  I mean, I can't

14  speak for anybody else.  I mean, I don't know whether

15  they did what they were supposed to do or not.

16      Q.   Well, the purpose of the union, ostensibly,

17  is to protect the rights of the members.  Would you

18  agree or would you have no comment on that?

19      A.   I really don't have any comment.  The only

20  time I seen them was when they was passing out hats or

21  something, you know, so I really don't know.

22      Q.   Did you know that Will Robinson was a member

23  of the union?

24      A.   He should have been.

25      Q.   Are you aware that there is an Employee

```
 1   Assistance Program at Anheuser-Busch?
 2        A.   Yes.  Barb Brigham.
 3        Q.   Have you ever utilized the EAP?
 4        A.   Yes, I have.
 5        Q.   When did you utilize the EAP?
 6        A.   I utilized them after the initial sexual
 7   harassment and -- well, and after Kathy's house was set
 8   on fire, we -- I made an appointment, as well as Kathy,
 9   and we talked with her.
10        Q.   Were you referred to the EAP by Shirley
11   Scales?
12        A.   I don't recall.  I was referred, but I don't
13   recall by whom.
14        Q.   Was it somebody from the HR Department that
15   referred you to EAP?
16        A.   Most likely, yes.
17        Q.   And to your recollection, you called EAP
18   after Kathy Jackson's house was set on fire?
19             MR. SPATER:  Object to the form of the
20   question.
21   BY MR. KNUEVE:
22        Q.   Let me try to rephrase the question.
23             Let me just ask you:  When do you recall
24   using the EAP?
25        A.   I recall speaking with Barb, and Kathy had
```

1          A TWO-PAGE GAUNT/GRACE LETTER,

2          DATED 5/4/99, BATES-STAMPED

3          ABI-000264 AND 265, WAS MARKED AS

4          EXHIBIT 9.

5                    - - -

6      Q.   Ms. Grace-Hawkins, the court reporter has

7   handed you what's been marked as Exhibit 9.  Do you

8   recognize Exhibit 9?

9      A.   Yes.

10     Q.   And this is a letter from Elaine Gaunt

11  confirming Anheuser-Busch's offer of a full-time

12  position with Anheuser-Busch; correct?

13     A.   Correct.

14     Q.   And it also indicates that you have accepted

15  the offer --

16     A.   Correct.

17     Q.   -- in that very first sentence there?

18     A.   Uh-huh.

19     Q.   Yes?

20     A.   Yes.

21     Q.   So it appears that you were offered full-time

22  employment on May 4, 1999; correct?

23     A.   Correct.

24     Q.   And if you take a look at the second page of

25  Exhibit 9, it indicates that your first day of

1     full-time employment would be May 17, 1999?

2        A.    Uh-huh.

3        Q.    Yes?

4        A.    Yes.

5        Q.    Does that refresh your recollection of when

6     you began full-time employment with Anheuser-Busch?

7        A.    Yes, it does.

8        Q.    And it was May 17 of 1999; correct?

9        A.    Correct.

10                     - - -

11          A ONE-PAGE DOCUMENT ENTITLED,

12          "EMPLOYEE GROUP TERM LIFE INSURANCE

13          BENEFIT, BENEFICIARY DESIGNATION

14          FORM," DATED 6/2/99, BATES-STAMPED

15          ABI-000245, WAS MARKED AS EXHIBIT

16          10.

17                     - - -

18     BY MR. KNUEVE:

19        Q.    Ms. Grace-Hawkins, the court reporter has

20     handed you what's been marked as Exhibit 10. Do you

21     recognize that document?

22        A.    Yes.

23        Q.    Does your handwriting appear on Exhibit 10?

24        A.    Yes.

25        Q.    And it appears that you signed Exhibit 10

83

```
 1        A.    Specific, no.

 2        Q.    Now, you are aware that Anheuser-Busch has

 3   policies preventing harassment?

 4        A.    Yes.

 5                         - - -

 6             A TWO-PAGE DOCUMENT ENTITLED,

 7             "WORKPLACE HARASSMENT,"

 8             BATES-STAMPED ABI-001204 AND 1205,

 9             WAS MARKED AS EXHIBIT 13.

10                         - - -

11   BY MR. KNUEVE:

12        Q.    Ms. Grace-Hawkins, the court reporter has

13   handed you what has been marked as Exhibit 13.  Do you

14   recognize that document?

15        A.    Yes.

16        Q.    This is a copy of Anheuser-Busch's policy

17   prohibiting harassment in the workplace?

18        A.    Correct.

19        Q.    And Exhibit 13 indicates that sexual

20   harassment is prohibited by Anheuser-Busch?

21        A.    That's correct.

22        Q.    And Exhibit 13 also contains a complaint

23   procedure?

24        A.    Correct.

25        Q.    And an employee of Anheuser-Busch is able to
```

1  register a complaint of sexual harassment under the

2  complaint procedure; is that correct?

3      A.   Correct.

4      Q.   And if you look at the second page of Exhibit

5  13, step one indicates that an employee may complain to

6  his or her supervisor?

7      A.   Correct.

8      Q.   Or to the head of his or her department?

9      A.   Correct.

10      Q.   Or to the local Human Resources Manager;

11  correct?

12      A.   Correct.

13      Q.   And there's also a toll-free 1(800) number in

14  there?

15      A.   Correct.

16                        -  -  -

17           AN 18-PAGE DOCUMENT ENTITLED,

18           "RESPECT IN THE WORKPLACE:

19           PREVENTING SEXUAL AND OTHER

20           HARASSMENT, PARTICIPANT'S GUIDE,"

21           BATES-STAMPED 000041 THROUGH 58,

22           WAS MARKED AS EXHIBIT 14.

23                        -  -  -

24  BY MR. KNUEVE:

25      Q.   Okay.  Ms. Grace-Hawkins, the court reporter

85

1   has handed you what's been marked as Exhibit 14 and

2   I'll represent to you that this was a set of documents

3   produced by your counsel.  Do you recognize Exhibit 14?

4        A.   Yes.

5        Q.   What is Exhibit 14?

6        A.   "Respect in the Workplace."

7        Q.   These are training materials that were

8   prepared by Anheuser-Busch?

9        A.   Yes.

10       Q.   And these are materials that were provided to

11  you?

12       A.   Early on, I believe, yes.

13       Q.   And, in fact, did you attend a training

14  session entitled, "Respect in the Workplace"?

15       A.   Yes.

16       Q.   And, in fact, you've attended that training

17  session on multiple occasions?

18       A.   Yeah, quite a few times.

19       Q.   Do you know how many times that you've

20  attended that training session?

21       A.   No.  I didn't count.

22       Q.   More than five?

23       A.   Could be.  I mean, I wasn't counting, so, I

24  mean ....

25       Q.   All right.  So Anheuser-Busch could have

FRALEY, COOPER & ASSOCIATES
(800) 852-6163      (614) 228-0018      (740) 345-8556

```
1   trained you on sexual harassment and prohibitions on

2   sexual harassment more than five times during your

3   employment?

4        A.   Could have been five, could have been three.

5   I'm not sure.

6        Q.   Have you reviewed the materials that are

7   contained in Exhibit 14?

8        A.   All the materials that we were given, yes,

9   we -- when we have those meetings, you go over them.

10  Yeah.

11       Q.   Okay.  So during the training session,

12  somebody goes through all of the materials contained in

13  Exhibit 14 with the employees?

14       A.   Most -- most of the time, I think it's like

15  an overhead and then you have a speaker up and I don't

16  think they go through it word-for-word --

17       Q.   Okay.

18       A.   -- but touch bases on it.

19       Q.   How long did the training sessions last?

20       A.   I haven't been to one in awhile.  I think it

21  was -- might have been half a shift or something.  I'm

22  not sure.

23       Q.   Is it your understanding that all the

24  employees at the Brewery go through the training

25  session, "Respect in the Workplace"?
```

1     A.   Yes.

2     Q.   So Anheuser-Busch trains all of its employees

3 on these materials, "Respect in the Workplace"?

4     A.   From my understanding, yes.

5     THE WITNESS:  I don't -- can I --

6     MR. SPATER:  Just ....

7     THE WITNESS:  Oh, all right.  Sorry.

8     (Discussion off the record.)

9          - - -

10     A DOCUMENT ENTITLED, "RESPECT IN

11     THE WORKPLACE ... WORKPLACE

12     HARASSMENT POLICY," BATES-STAMPED

13     000063 AND 64, WAS MARKED AS

14     EXHIBIT 15.

15          - - -

16 BY MR. KNUEVE:

17     Q.   Ms. Grace-Hawkins, the court reporter has

18 handed you what has been marked as Exhibit 15 which

19 I'll represent to you is a document produced by your

20 counsel.  Do you recognize Exhibit 15?

21     A.   Uh-huh.

22     Q.   Yes?

23     A.   Yes.

24     Q.   Exhibit 15 is a copy of a pamphlet entitled

25 "Respect in the Workplace"; is that correct?

1    A.   Correct.

2    Q.   And how did you receive Exhibit 15?

3    A.   I believe these were given in the "Respect in

4  the Workplace" workshop or meeting or whatever you want

5  to call it.

6    Q.   You received a copy of Exhibit 15 during your

7  training session entitled, "Respect in the Workplace"?

8    A.   Correct.

9    Q.   Did you receive a copy of Exhibit 15 in each

10  training session you attended?

11    A.   I believe they would give us some

12  information.  I'm not sure if it's the exact thing

13  or -- or what.

14    Q.   Now, Exhibit 15 contains a paragraph

15  (indicating) that indicates that an employee who has a

16  complaint of workplace harassment can -- well,

17  actually, it says should immediately report the problem

18  to his supervisor, to the head of his/her department or

19  to the local Human Resources Manager.  Do you see that?

20    A.   Uh-huh.

21    Q.   Yes?

22    A.   Yes.

23    Q.   And it also contains a toll-free 1(800)

24  number?

25    A.   Correct.

1    Q.    Did you read Exhibit 15 at the time that it

2  was handed to you?

3    A.    I'm sure I did.

4                      - - -

5          A ONE-PAGE DOCUMENT ENTITLED,

6          "SEXUAL HARASSMENT, COMPLAINT

7          PROCEDURE," EFFECTIVE 12/1/96,

8          BATES-STAMPED 000065, WAS MARKED AS

9          EXHIBIT 16.

10                     - - -

11 BY MR. KNUEVE:

12    Q.    Ms. Grace-Hawkins, the court reporter has

13 handed to you what's been marked as Exhibit 16 which

14 I'll represent to you was produced by your counsel, and

15 can you identify that document, please?

16    A.    It's a "Complaint Procedure, Sexual

17 Harassment."

18    Q.    And it appears to be an earlier edition of

19 Exhibit 13; would you agree with that?

20    A.    Sure.

21    Q.    How did you get a copy of Exhibit 16?

22    A.    I believe this was given to us initially when

23 I was hired in.

24                     - - -

25          A ONE-PAGE DOCUMENT ENTITLED,

1       "WORKPLACE VIOLENCE POLICY," WAS

2       MARKED AS EXHIBIT 17.

3                        - - -

4       MR. KNUEVE:  Can we take a break?

5       THE WITNESS:  Sure.

6       (Recess taken.)

7  BY MR. KNUEVE:

8       Q.   Back on the record.

9            Ms. Grace-Hawkins, I think, right before we

10  broke, the court reporter had handed you what was

11  marked as Exhibit 17, which I'll represent to you is a

12  document produced by your counsel in this case.  Do you

13  recognize Exhibit 17?

14       A.   I mean, yeah, I recognize it.  I believe it

15  was with a packet that Sandy gave.

16       Q.   Let me ask the question a different way.

17            Are you aware that Anheuser-Busch prohibits

18  workplace violence?

19       A.   I am aware of it, yes.

20       Q.   Since you have been employed with

21  Anheuser-Busch, have you always been aware that

22  Anheuser-Busch prohibits workplace violence?

23       A.   Yes.

24       Q.   And have you always been aware that

25  Anheuser-Busch had a policy -- a written policy --

1    prohibiting workplace violence?

2         A.    I believe so, yes.

3         Q.    And were you always aware that, if you had a

4    complaint about workplace violence, that you could make

5    a complaint to somebody at Anheuser-Busch?

6         A.    Correct.

7                          - - -

8              A ONE-PAGE CORRELL AND HANSEN/ALL

9              COLUMBUS BREWERY EMPLOYEES LETTER,

10             DATED 5/17/01, BATES-STAMPED

11             000042, WAS MARKED AS EXHIBIT 18.

12                         - - -

13             A ONE-PAGE BOBAK/EMPLOYEE LETTER,

14             DATED 1/4/02, BATES-STAMPED 000041,

15             WAS MARKED AS EXHIBIT 19.

16                         - - -

17             A ONE-PAGE MUHLEMAN/BREWERY

18             OPERATIONS & TECHNOLOGY EMPLOYEES

19             LETTER, RE:  RESPECT IN THE

20             WORKPLACE, DATED 5/22/03,

21             BATES-STAMPED ABI-001753, WAS

22             MARKED AS EXHIBIT 20.

23                         - - -

24   BY MR. KNUEVE:

25        Q.    Okay.  Ms. Grace-Hawkins, the court reporter

1    has handed you three documents, marked Exhibits 18, 19

2    and 20.  Exhibits 18 and 19 were produced by your

3    counsel in this case.  Do you recognize Exhibit 18?

4        A.   I do recognize 18, yes.

5        Q.   And this is a letter from the then-Plant

6    Manager, Jim Correll, and the Brewmaster, Todd Hansen,

7    to all employees of the Brewery; correct?

8        A.   Correct.

9        Q.   And the letter discusses Anheuser-Busch's

10   Respect in the Workplace Policy, the training, and

11   reminds everyone about the policy prohibiting sexual

12   harassment; correct?

13       A.   Correct.

14       Q.   And that final paragraph indicates that, if

15   you have any questions about the policy or if you

16   experience workplace harassment, you should contact the

17   Corporate Compliance Department or the local Human

18   Resources Office.  Do you see that?

19       A.   Yes.

20       Q.   And this was a letter that was mailed to all

21   Columbus Brewery employees?

22       A.   Correct.

23       Q.   So you received this letter in the mail?

24       A.   I believe so.

25       Q.   And you received it around May of 2001?

1     A.   That's what it says.

2     Q.   Okay.  Do you agree that Anheuser-Busch

3  periodically mails letters like this to employees?

4     A.   Periodically, Anheuser-Busch mails all kinds

5  of letters.  I mean, we get a lot of stuff, so ....

6     Q.   And among that "stuff," among the letters

7  that you receive from Anheuser-Busch, are letters

8  reminding employees of the harassment policy?

9     A.   Periodically.

10    Q.   Now, look at Exhibit 19.  This would be

11  another example of a letter sent by the company to

12  employees reminding employees of the

13  workplace-harassment policies?

14    A.   Correct.

15    Q.   Did you receive Exhibit 19?

16    A.   Probably.

17    Q.   Okay.  And Exhibit 19 is dated January 4,

18  2002; correct?

19    A.   Correct.

20        It's kind of hard to say.  We get a bunch of

21  stuff and a bunch of packets and to say, ah, this one,

22  this one ....

23    Q.   If somebody from Anheuser-Busch were to

24  testify that Exhibit 19 was sent to all employees of

25  Anheuser-Busch nationwide, you would have no reason to

94

```
 1   dispute that?

 2        A.    That's correct.

 3        Q.    And Exhibit 20 is another example of a letter

 4   regarding the Respect in the Workplace Policy and the

 5   policies prohibiting harassment; correct?

 6        A.    Correct.

 7        Q.    And this one is dated May 22, 2003?

 8        A.    Correct.

 9        Q.    And did you receive Exhibit 20?

10        A.    I do remember receiving one in May after the

11   incident.

12        Q.    Okay.  The incident with Will Robinson?

13        A.    Correct.

14        Q.    So you recall that, shortly after the

15   incident with Will Robinson, you received a letter like

16   Exhibit 20 in the mail?

17        A.    Correct.

18        Q.    And with each of these letters, the pamphlet

19   that we looked at earlier, Exhibit 15, was enclosed?

20        A.    I can't say if it was enclosed or not.  I

21   really don't remember.

22        Q.    Do you remember that the pamphlet, Exhibit

23   15, was enclosed with some of the letters that you

24   received?

25        A.    Could have been.
```

95

1    Q.    And if somebody from Anheuser-Busch were to

2  testify that this pamphlet was enclosed with a

3  letter -- with some letters, you wouldn't be able to

4  dispute that?

5    A.    I wouldn't be able to dispute it, but I don't

6  remember.

7    Q.    Okay.

8                          - - -

9         A TWO-PAGE DOCUMENT ENTITLED,

10        "WORKPLACE HARASSMENT, POLICY

11        NUMBER H-2, EFFECTIVE DATE:

12        3/1/01, BATES-STAMPED ABI-001755

13        AND 1756, WAS MARKED AS EXHIBIT 21.

14                        - - -

15  BY MR. KNUEVE:

16    Q.    Ms. Grace-Hawkins, the court reporter has

17  handed you what's been marked as Exhibit 21.  Do you

18  recognize that document?

19    A.    This was for salaried employees.

20    Q.    Have you ever seen Exhibit 21 before?

21    A.    I can't say that I have, can't say that I

22  haven't.

23    Q.    Are you familiar with the company's intranet?

24    A.    Yes, I am.

25    Q.    And employees can access the company's

FRALEY, COOPER & ASSOCIATES
(800) 852-6163      (614) 228-0018      (740) 345-8556

```
 1   intranet --
 2        A.   Correct.
 3        Q.   -- from computers that are located at the
 4   Brewery?
 5        A.   Yes.
 6        Q.   And if you wanted to access the company's
 7   computer at the Brewery, where would you go?
 8        A.   You could go to the lunchroom.  There's two
 9   computers.  You can also go to -- there is -- where the
10   pay phone -- there's a pay phone and it's right beside
11   the women's locker room.  There's two computers there.
12   Other than that, there -- the other computers are
13   mostly for, you know, foremens.  So, really, those are
14   most of the ones that you can get -- spend time on or
15   whatever.
16        Q.   Have you used the company's computer to
17   access the company's intranet?
18        A.   Not really.  The only thing that I -- I did
19   use it for here recently was to put in a suggestion for
20   a piece of equipment, and that was within the last
21   couple months.
22             But keep in mind, we have all those employees
23   and only a set amount of computers, so ....
24        Q.   Are you aware that all the company's policies
25   are posted on the intranet?
```

1    A.    I'm sure they would be.

2    Q.    So that any employee can look up any one of

3 the policies on the intranet; correct?

4    A.    Correct.

5    Q.    So would you agree with me if I were to say

6 that, since the time that you were employed with

7 Anheuser-Busch, you've always been aware that the

8 company had a policy prohibiting sexual harassment?

9    A.    Correct.

10    Q.    And you have always been aware that you could

11 register a complaint about sexual harassment?

12    A.    Correct.

13    Q.    And you've always been aware that you could

14 go to the Human Resources Department to register a

15 complaint?

16    A.    Correct.

17    Q.    Or that you could complain to your foreman?

18    A.    Correct.

19    Q.    Or the line supervisor?

20    A.    That's correct.

21    Q.    And the company trains all employees on its

22 policies prohibiting sexual harassment; would you agree

23 with that?

24    A.    Correct.

25    Q.    And the company posts the policies on the

98

```
1   intranet with computers that are available to
2   employees; correct?
3        A.   Correct.
4        Q.   And the company also mails its policies
5   prohibiting sexual harassment to all employees?
6        A.   Periodically.
7        Q.   Okay.
8             Now, are you aware, is there anything about
9   sexual harassment at all in the union contract?
10       A.   Am I aware of --
11       Q.   Is there anything about sexual harassment in
12   the union contract?
13       A.   I don't know.
14       Q.   Has anybody from the union ever talked to you
15   about sexual harassment?
16       A.   No.  Other than Amy Baucum after all this
17   happened, no.
18       Q.   Did anybody from the union tell you that the
19   union prohibited sexual harassment between members?
20       A.   No.  Not to my knowledge.
21       Q.   Let's take a look at the union contract,
22   Exhibit 12.
23       A.   Okay.
24       Q.   Can you pull it out?  And look at the Table
25   of Contents and see if there is anything in there about
```

```
 1    sexual harassment or respect in the workplace.
 2        A.   Unless I'm missing it, I don't see anything.
 3        Q.   So, to the best of your knowledge, there's
 4    nothing in the union contract at all that speaks to
 5    sexual harassment?
 6        A.   Not that I can see.  I haven't seen anything.
 7    I'm not saying it's not, but I haven't seen anything.
 8        Q.   You have seen nothing; correct?
 9        A.   Correct.
10        Q.   Have you ever received any letter from the
11    union at all relating to sexual harassment?
12        A.   Not that I can remember.
13        Q.   Have you ever received any training from the
14    union relating to sexual harassment?
15        A.   No.
16        Q.   Has there ever been a meeting of union
17    members where sexual harassment was a topic that has
18    been discussed?
19        A.   Not to my knowledge.
20        Q.   So, fair to say that Anheuser-Busch has
21    provided you with numerous training opportunities and
22    examples of the sexual-harassment policies and the
23    union has provided you with nothing?
24        A.   Correct.
25        Q.   When did you first meet Will Robinson?
```

1    A.    I first met him after my Apprenticeship,

2   which was when I went to midnights.

3    Q.    Okay.  And he was an employee at the time?

4    A.    Yes.

5    Q.    So you met him when you went onto the

6   midnight shift?

7    A.    That's correct.  He worked midnights so

8   that's when I initially even saw him.  Other than that,

9   I never paid any attention.

10    Q.    Had you heard anything about Mr. Robinson

11   before you met him?

12    A.    No.  Before I met him, no.

13    Q.    Now, how many lines are operating on the

14   midnight shift?

15    A.    All of them.  There's -- Let's see.  There's

16   three can lines and four bottle lines.

17    Q.    So there's seven lines operating during the

18   midnight shift?

19    A.    Correct.  Every shift.

20    Q.    Was that true at the time, back in 1999 --

21   or, I'm sorry, 2002?

22    A.    In 2002, yes.  '99, no, because 75, which was

23   a new line, hadn't came up at that particular time.

24    Q.    Let me ask the question a different way:  At

25   the time that you were transferred to midnight shifts,

1    Q.    Do you know what line Will Robinson was

2  working?

3    A.    When I first came to midnights?

4    Q.    Yes.

5    A.    I imagine he was -- No, I won't say that.

6          I really don't know.

7    Q.    Now, I believe you came to midnights around

8  2002?

9    A.    Yes.

10    Q.    And when you first came to midnights, how

11  much interaction, if any, did you have with Mr.

12  Robinson?

13    A.    None.  None, really.

14          Then, later on, by passing.  Then I got --

15  started getting scheduled back there.

16    Q.    And when did you start getting scheduled?

17    A.    Not right away.  I don't have a timeframe,

18  but not right away.  I was being, like, just moved

19  around.  Until they really find a spot for you, they

20  just kind of moved you around.

21    Q.    And what was the spot that they found for

22  you?

23    A.    Eventually, I started working with Kathy on

24  the early side.

25    Q.    And that's Line 75?

FRALEY, COOPER & ASSOCIATES
(800) 852-6163     (614) 228-0018     (740) 345-8556

```
 1        A.   Line 75.
 2        Q.   And she was working on filler and you were
 3   working on labeler?
 4        A.   We were both filler/labeler.
 5        Q.   Okay.
 6             And when you first went to Line 75, was Will
 7   Robinson already working Line 75?
 8        A.   Yeah, he had already -- he went to the
 9   training when the line first came up, so, yeah, he was.
10        Q.   What was his position?
11        A.   He ran the packer mostly.  I think he did do
12   some service work.  It depends on, if somebody called
13   in or something, then they would kind of move people
14   around, but ....
15        Q.   Now, I understand that, at some point, Will
16   Robinson loaned you $1,500?
17        A.   Yeah.
18        Q.   Can you tell us how that happened?
19        A.   I was going through a divorce.  After I got
20   into the house, attorney fees.  I was ordered to pay
21   spousal support.
22        Q.   You were ordered to pay spousal support?
23        A.   Right.
24             And it was Christmastime and he loaned me
25   money until the following week when I got paid.
```

1     Q.   Was this Christmas of 2002?

2     A.   2000-and -- yes, yes, because it was January

3 of 2003 when -- the end of that -- first week when we

4 went back to work, that's when I paid him back, so the

5 loan was for a week.

6     Q.   Now, before he loaned you the $1,500, I

7 assume that you and Mr. Robinson got along pretty well

8 together?

9     A.   Yeah, we were all -- we worked as a team.

10     Q.   And when you say "we worked as a team," you

11 mean you, Mr. Robinson and Kathy Jackson?

12     A.   Kathy Jackson, Kieana, whoever was on that

13 line because of the way it was set up, and it's the

14 fastest bottle line in the plant.  It had to be a team

15 effort all the time.

16     Q.   So before Christmas of 2002, is it fair to

17 say you had no reason to complain about Mr. Robinson?

18     A.   No, he was a funny guy.

19     Q.   And when you say "he was a funny guy," what

20 do you mean?

21     A.   Jokester.  He was always telling jokes.

22     Q.   Was Mr. Gress your foreman at this time?

23     A.   Yes.

24     Q.   And Terry Williamson was the line supervisor?

25     A.   Terry Williamson was a foreman, also.  When

1    we didn't have Gress, we had Terry Williamson.

2    Initially, when we first started out, I believe Dave

3    Burke was back there.

4         Q.   Okay.

5         A.   So, sometimes, they'd switched foremens.  We

6    didn't have the same foreman all the time, but when

7    this incident happened, we -- Gress was back there.  We

8    had him for awhile.

9         Q.   Why did you and Mr. Hawkins get divorced?

10        A.   Drinking.  He had an alcoholic problem.

11        Q.   And did you speak with Mr. Robinson about

12   that?

13        A.   He knew.  Everybody -- everyone knew that Ron

14   had a problem with drinking.  For the most part, all

15   the guys that worked there for that long had a problem

16   drinking.

17        Q.   Did you speak with Mr. Robinson about the

18   divorce?

19        A.   Vaguely.

20        Q.   Now, I understand that he, at some point,

21   went to your house to hang lights?

22        A.   Yes.

23        Q.   When was that?

24        A.   April -- I believe April 29th.  I have the

25   check.

1   Q.   April 29th, 2003?

2   A.   Right.

3   Q.   And what lights was he hanging?

4   A.   He hung a motion light on my deck and he

5   changed the front decorative light at the front door.

6   Q.   And you said you have the check.  Did you pay

7   him for his work or did you offer to pay him for his

8   work?

9   A.   I paid him -- I wrote him a check for the

10  work, but after this -- after the harassment was

11  brought to his attention, he laid the check on a cart

12  in front of the labelers, so I have the check now.

13  Q.   So April 29, 2003, he comes to your house to

14  do some work on some lights?

15  A.   Right.  He followed me to my house.  He

16  followed me to my house.  We got off of work, he

17  followed me to the house.

18  Q.   You intended for him to follow you to your

19  right?

20  A.   Right.

21  Q.   He was invited to come over?

22  A.   That's correct.

23  Q.   And you invited him to come over?

24  A.   Right, to do my lights.

25  Q.   So prior to April 29, 2003, would it be fair

FRALEY, COOPER & ASSOCIATES
(800) 852-6163      (614) 228-0018      (740) 345-8556

1    to say that you and Mr. Robinson got along?

2        A.    Yeah, we got along.  We were teammates at

3    work and --

4        Q.    You had no reason to complain about him prior

5    to April 29, 2003?

6        A.    No.  No.

7        Q.    Had you invited Mr. Robinson to your home any

8    other times?

9        A.    No.

10       Q.    Did you and Mr. Robinson have any kind of

11   romantic relationship?

12       A.    No.

13       Q.    He was a friend?

14       A.    He was a friend.

15       Q.    And I take it that, before April 29, 2003,

16   you were not intimidated by Mr. Robinson?

17       A.    No.

18       Q.    You weren't afraid of him?

19       A.    No.

20       Q.    I think you mentioned Kieana Shelton?

21       A.    Yes.

22       Q.    So, obviously, you know Kieana Shelton?

23       A.    Yes, she worked on the line with us, also.

24       Q.    Did you know whether she and Mr. Robinson had

25   a romantic relationship?

1    and William were breaking up or having problems or she

2    was going back to her husband, something.  I mean, it

3    was just -- they were splitting up, more or less.

4         Q.    Okay.  So let's talk about May 16, 2003.

5         A.    Okay.

6         Q.    Before that day, had you had any cause to

7    complain about Mr. Robinson?

8         A.    No, not really.  No.

9         Q.    Why don't you tell us what happened on that

10   day.

11        A.    On that night, we went in to work and

12   something -- I can't remember.  Something had happened

13   where the pasteurizer was full of beer and it had been

14   in there longer than eight hours.  So, usually, you

15   would run the bottles of beer through the labelers to

16   put labels on them, but being that this beer was going

17   to be thrown away, we ran them through the labelers

18   without putting labels on them.  So one of us had to be

19   able to cut the conveyor off and on while the other

20   ones pulled the hoppers in and out that the beer was

21   going to, and then some people were on tow motors that

22   were dumping them.  So it was almost like an assembly

23   line that we had going on.  And then another person had

24   to be cleaning up because glass was going everywhere

25   from the bottles, would be popping and going

114

1  everywhere. You kind of had to stand back.

2  And so I was controlling the conveyor. Kathy

3  and Bill were pulling hoppers in and out. Bob Theisen

4  was one of the tow-motor drivers. And so we were

5  just -- I was turning them on and off, filling up the

6  hoppers, and I was talking and Bill was playing around

7  and I was, like, put my hands up, like, you know, *Go*

8  *away. Don't. You know, you need to cut it out.* You

9  know, we were just telling him to chill out. And Kathy

10 was to the left of me, and she said something and I

11 turned around to look at her, and that's when he

12 forcefully poked me in the right breast.

13    Q. What happened next?

14    A. Kathy screamed and covered her mouth. I was

15 shocked, pissed off, humiliated, and I told him if he

16 ever did that again, I would break his fuckin' arm.

17 So ....

18    Q. What, if anything, did he say?

19    A. He started laughing. He was dancing around.

20 He said, "I did it, you know, what are you gonna do?"

21    Q. Did anybody else witness this? Was anybody

22 else around?

23    A. It was Kathy, myself and William.

24    Q. Now, had you knocked his hat off his head

25 before then?

1      A.   No.

2      Q.   Had you touched his hat?

3      A.   It flickered.  His hat did.

4      Q.   You flicked his hat?

5      A.   Flickered the top, like the beak part, the

6   round part.

7      Q.   You flicked the beak of his cap?

8      A.   Yeah, but that was early on.

9      Q.   And why did you do that?

10      A.   He was just playing around so much and we

11   were telling him to cut it out and he was -- he just

12   kept going and going.

13      Q.   Now, would it be fair to say that, before

14   this incident, you and Mr. Robinson were friends?

15      A.   We were friends.

16      Q.   And, in fact, that day, you were joking with

17   Mr. Robinson before he poked you in the breast?

18      A.   No.  Mr. Robinson was doing a lot of

19   horseplaying and -- Go ahead.

20      Q.   But you flicked his hat?

21      A.   Yeah, I flicked his hat.

22      Q.   And were you intending to do that as a joke?

23      A.   I don't know what I was intending.  Maybe it

24   was to get him to calm down.  I don't know.  I don't

25   know.

1    Q.   Do you think flicking somebody's hat is going

2  to calm them down?

3    A.   Well, he wasn't acting his normal way,

4  so ....

5    Q.   So what happened next after you told Mr.

6  Robinson that if he did it again, you'd break his

7  fucking arm?

8    A.   He just started dancing around and he made

9  the comment, "Yeah, I did it. So what? What are you

10 gonna do?" And I think we might have dumped a couple

11 more hoppers. I was pretty pissed. I think I left and

12 I went to the restroom, and I came back, and after

13 that, sooner or later, it was like break-time, it was

14 lunchtime.

15   Q.   Do you know what day this was?

16   A.   This was on a Friday.

17   Q.   Okay. Did you work that next Saturday?

18   A.   I don't even recall.

19   Q.   Did you work on Sunday?

20        Do you work on Sundays?

21   A.   I work on Sundays but you sign up for

22 overtime. I don't know if I had signed up for that

23 weekend or not.

24   Q.   Did anything more happen that day, that

25 Friday?

117

1     A.   No.  I pretty much kind of stayed off to

2  myself.  I talked to Kathy and LaDawn Hudson and --

3     Q.   Did you and Kathy talk about this incident?

4     A.   Yes, we talked about the incident.

5     Q.   And what was said?

6     A.   I was determining, you know, what to do or

7  who to see or who to tell.  She was, more or less,

8  trying to be supportive.

9     Q.   And when you say you were determining who to

10  see or tell, what were you determining?

11     A.   Well, Jim Gress was our regular foreman at

12  that time.  We had Terry Williamson for that -- just

13  for that day.  Jim Gress wasn't there, I don't believe.

14  He was -- yeah, I don't think he was at work that --

15  that day.

16     Q.   And why wouldn't you just have gone down to

17  HR?

18     A.   We are on midnight shift.  HR isn't open.

19     Q.   Okay.  Now, you talked to Jim Gress about

20  this incident on May 20, 2003?

21     A.   Monday.  I believe it was Monday.

22     Q.   Okay.  I have May 20, 2003 as the first time

23  you spoke to Jim Gress, which, if May 16 was Friday,

24  May 20th would have been Tuesday.

25     A.   I think May 20th is -- I don't know.  I would

1    have to look at the calendar but I'm sure -- I'm pretty

2    sure that it was a Monday when I talked to Jim Gress.

3        Q.   What did you tell Jim?

4        A.   I asked him could I talk to him and I told

5    him exactly what happened.

6        Q.   Now, before then, before that conversation

7    with Jim, you hadn't talked to any foreman; --

8        A.   Foreman, no.

9        Q.   -- correct?

10       A.   Correct.

11       Q.   And you hadn't talked to anybody at HR about

12   this incident?

13       A.   No.

14       Q.   Had you talked to any managers or supervisors

15   about the incident before you spoke with Jim Gress?

16       A.   No, Jim Gress was the first.

17       Q.   So that was the first person you talked to,

18   to tell about this incident; correct?

19       A.   Right.

20       Q.   And what did you tell him?

21            You told Jim what happened?

22       A.   That's correct.

23       Q.   Now, do you remember telling Jim that you

24   believe this to be confidential?

25       A.   Yeah, I wanted it to be a confidential

1    conversation between him and I.  I didn't know what

2    I -- what to expect at that particular time.

3         Q.    Did you tell Jim that you didn't want any

4    action to be taken against Mr. Robinson?

5         A.    What I told Jim is that I wanted to be taken

6    off the line or I wanted William to be taken off the

7    line.  I didn't want to work with him anymore.

8         Q.    Between May 16, 2003 and the time that you

9    spoke with Mr. Gress, had you worked with Bill again?

10        A.    He was still there, I think, for a day or two

11   after, until they -- they took him off the line.

12        Q.    Did you speak with Bill again after May 16,

13   2003?

14        A.    No, I didn't.

15        Q.    Did he ever say anything to you after May 16,

16   2003?

17        A.    No.  He just danced a lot and did a lot of

18   kind of grinding stuff up on the packer when you'd see

19   him, going by.  Just kind of obnoxious stuff.

20        Q.    Okay.  So, fair to say that after May 16,

21   2003, you never spoke with Bill Robinson again?

22        A.    Not verbally, that's correct.

23        Q.    And he never touched you again after May 16,

24   2003?

25        A.    That's correct.  I avoided -- I avoided him.

120

1    Q.   So what did Jim tell you or say after this
2  conversation with him?
3    A.   He told me he could see what he could do
4  about getting Bill off the line.
5        And I told him, "Well, he's the one that
6  caused this incident.  I shouldn't have to move off the
7  line."
8        He said, well, he could see what he could do
9  about getting him moved off the line, and I said fine.
10  He said he would let me know.
11    Q.   And then what was the next thing that
12  happened in this chain of events?
13    A.   The next thing that happened is:  Jim came
14  back to me and said that he had good news and then he
15  had bad news.  The good news was that Bill would be
16  taken off the line, and the bad news was that he had to
17  report it -- he had to report it.  He didn't say to
18  who.  He just said he had to report it, I believe.
19    Q.   Did you ask him not to report it?
20    A.   I didn't ask him not to report it and I
21  didn't ask him to report it.
22    Q.   Do you know when that conversation with Jim
23  occurred?
24    A.   Might have been the day after I spoke to him.
25    Q.   Did he tell you that he had spoken with Terry

1   Williamson?

2       A.   Yes.   He said Terry Williamson encouraged him

3   to report it.

4       Q.   And he did not tell you he was going to tell

5   HR?

6       A.   He didn't say.  He just said "report it."  If

7   not, he would be -- if something else was to happen, he

8   could lose his job if he didn't report it.  That's more

9   or less what he said.

10      Q.   That's what Jim told you?

11      A.   That's what Jim told me.

12      Q.   And I think your testimony is that you didn't

13  ask him to report it, you didn't ask him not to report

14  it?

15      A.   Right.  I thought we were talking

16  confidential, though.

17      Q.   Did you not want him to report it?

18      A.   I didn't -- For the main part at that

19  particular time, what I did want was not to have to

20  work with Bill anymore.  I didn't want to have to be

21  around him.

22      Q.   Was Bill, in fact, moved off the line?

23      A.   Yes, he was.

24      Q.   Was it that day that Jim talked to you the

25  second time?

1    A.   It might have been.  I know, after the
2  incident, he was still on the line for a day or two, so
3  that could be true.
4    Q.   After the incident on May 16, 2003, Bill was
5  still on the line for a day or two?
6    A.   Right, before they had actually took him off
7  the line.
8    Q.   But then after you spoke with Jim, Bill was
9  taken off the line?
10    A.   Yes, he was officially taken off.
11    Q.   After you spoke with Jim, I take it you never
12  saw Bill on the line again?
13    A.   After I spoke with Jim, I -- I'm trying to be
14  accurate here.  After I spoke with Jim, I believe it
15  might have been, like, the next day when Bill was taken
16  off the line.
17    Q.   Okay.  When Jim came and told you, "I have
18  some good news and some bad news," and he said, "The
19  good news is:  Bill is going to be taken off the line,"
20  Bill was, in fact, taken off the line that day; is that
21  correct?
22         MR. SPATER:  Object to the form of the
23  question.
24  BY MR. KNUEVE:
25    Q.   Well, did you see Bill on the line that day?

123

```
 1        A.   I saw Bill on the line.  I don't remember if
 2   it was that day or the next day that they removed him.
 3   It was -- he was still there, like, a day or so.
 4        Q.   So I think your testimony is:  You don't
 5   remember when he was taken off the line, you just
 6   remember it was sometime during this timeframe?
 7        A.   It was sometime after Jim Gress reported the
 8   incident.
 9        Q.   Okay.
10             Okay.  What's the next thing that happened?
11        A.   After that is when the check was -- was laid
12   on the cart when I came back from break.
13        Q.   Uh-huh.
14        A.   After that, I didn't see Bill.  I believe we
15   had a meeting with Shirley Scales and Jim was in there.
16        Q.   So Shirley Scales met with you and Jim Gress?
17        A.   Right.  They called me upstairs.
18        Q.   And when you say they called you downstairs
19   (sic) --
20        A.   Upstairs.
21        Q.   -- upstairs --
22        A.   The initial one was upstairs.
23        Q.   Okay.  Where?
24        A.   It was just in a little conference room or
25   something.
```

1    Q.    And it was just you, Shirley and Jim?

2    A.    Correct.

3    Q.    Okay.  What do you remember about that

4  conversation?

5    A.    She wanted to know exactly what happened.

6  She told me that it would have to be, like, in writing.

7  They would -- I would tell them what happened, they'd

8  type it up and I'd sign it and all this kind of stuff.

9  And that was, more or less, what the intentions were, I

10 guess.

11   Q.    Did you tell Ms. Scales that the information

12 that you had told Mr. Gress was confidential?

13   A.    I'm not sure.  I think I did.

14   Q.    Did you tell Ms. Scales that you had not

15 wanted to make a formal complaint?

16   A.    I told her I was afraid to make a formal

17 complaint just by the way that he was acting.

18   Q.    And why were you afraid to make a formal

19 complaint?

20   A.    He -- he just seemed to be a total different

21 person, and after this was filed, after the incident,

22 Kathy and I were talking and that's when people started

23 saying, "Well, she doesn't want to, you know, file any

24 complaint.  This guy is crazy, you know.  Stuff might

25 happen."  And that's when we started hearing these

1    probably would have left early if she'd gave me that

2    option.

3         Q.    After you found out about LaDawn Hudson's

4    allegations with respect to Mr. Robinson, did you tell

5    Jim Gress?

6         A.    Yes, I told Jim.

7         Q.    Did you tell Shirley Scales?

8         A.    Yes, I told Shirley about LaDawn, yes.

9         Q.    Do you know when that was?

10        A.    It was after the incident.  I mean, I don't

11   know the exact date.  I wasn't keeping a log.

12        Q.    Now, you are aware that, after its

13   investigation, the company terminated Mr. Robinson?

14        A.    Yes.

15        Q.    And the union filed a grievance over the

16   termination?

17        A.    Correct.

18        Q.    Did anybody from the union ever come to meet

19   with you about this situation?

20        A.    No.

21        Q.    Did anybody from the union ever come and tell

22   you or ask you not to make a complaint against Mr.

23   Robinson?

24        A.    No.

25        Q.    Did anybody from the union ever come to you

1   and express remorse for what Bill Robinson had done?

2       A.   No.

3       Q.   Did anybody from the union ever come to you

4   and offer any assistance at all?

5       A.   No.

6       Q.   So what the union did was file a grievance to

7   try to get Mr. Robinson back into the workplace?

8       A.   That's correct.

9       Q.   And you are aware that the union, in fact,

10  advanced the grievance to arbitration?

11      A.   Correct.

12      Q.   Which, in Anheuser-Busch terms, is

13  Multi-Plant?

14      A.   Correct.

15      Q.   Multi-Plant at Anheuser-Busch is like

16  arbitration?

17      A.   Arbitration, yes.

18      Q.   Were you required to attend Multi-Plant?

19      A.   No.  We just had to provide a statement and I

20  believe they notarized it.

21      Q.   Now, you are aware that the Multi-Plant

22  sustained the termination?

23      A.   Correct.

24      Q.   And how did you learn of that?

25      A.   One night, I came in to work and every --

133

1      Q.   Ms. Grace-Hawkins, the court reporter has

2  handed to you what's been marked as Exhibit 22.  Have

3  you seen that document before?

4      A.   This might be one of the ones that Sandy gave

5  me, I'm not sure.

6      Q.   Exhibit 22 indicates that Mr. Robinson was

7  terminated on June 2nd, 2003 as a result of an incident

8  which had occurred on May 16, 2003, and my first

9  question for you is:  Do you recall that Mr. Robinson

10  was terminated on June 2nd, 2003?

11      A.   I don't know what date he was terminated.  I

12  know he was terminated.

13      Q.   Do you have any reason to dispute that he was

14  terminated on June 2nd, 2003?

15      A.   No, I wouldn't.

16          That's as far as the Multi-Plant is

17  concerned; right?

18          MR. SPATER:  Just wait.

19                - - -

20          A ONE-PAGE DOCUMENT ENTITLED,

21          "GRIEVANCE FORM, TEAMSTERS LOCAL

22          UNION NO. 284," DATED 6/2/03,

23          BATES-STAMPED ABI-001212, WAS

24          MARKED AS EXHIBIT 23.

25                - - -

1              (Pause.)

2       Q.     Have you had an opportunity to read that

3   section of Exhibit 24?

4       A.     Yes.

5              MR. SPATER:  Which section?

6              MR. KNUEVE:  The section labeled:  "May 23

7   Meeting Present:  Jim Gress, Amanda Grace-Hawkins, and

8   Shirley Scales."

9              MR. SPATER:  Okay.

10  BY MR. KNUEVE:

11      Q.     You have had an opportunity to read that

12  section?

13      A.     Yes.

14      Q.     Now, first, would you agree that that

15  purports to be documentation of your first meeting with

16  Shirley Scales about Bill Robinson?

17      A.     It's just about accurate, yeah.

18      Q.     Is there anything in that section that you

19  disagree with?

20      A.     It says where I wouldn't offer any

21  information.  For the most part, she only wanted to

22  know what happened and my main thing was safety.

23      Q.     Okay.  And where are you looking at here?

24      A.     Right after the second paragraph, it says,

25  "Amanda would not offer information, so I

137

```
 1   proceeded ..."
 2            I mean, I did give her information but I was
 3   leary because of safety reasons.
 4       Q.   Other than that portion of this first section
 5   of Exhibit 24, do you disagree with anything else
 6   that's written there?
 7       A.   No, not really.
 8       Q.   So other than that one section, you would
 9   agree that this portion of Exhibit 24 is an accurate
10   representation of what happened during your first
11   meeting with Shirley Scales about Bill Robinson?
12       A.   For the most --
13            MR. SPATER:  If you need to take your time,
14   just take your time.
15            THE WITNESS:  Okay.  I'll take my time a
16   little bit here.
17            (Pause.)
18            I guess that's pretty accurate.  It's pretty
19   accurate.
20   BY MR. KNUEVE:
21       Q.   Okay.  Now, take a look, if you would, at
22   Page 3 of Exhibit 24, that's stamped ABI-1319, and
23   you'll see a section that's labeled May 27,
24   approximately 6:20 a.m., "Amanda Grace-Hawkins, Shirley
25   Scales."  Do you see that section.
```

138

1     A.   Yes.

2     Q.   I'd like you to read that section, please,

3 and again, I'll have the same questions at the end of

4 it.

5     A.   Okay.

6     Q.   Okay.  You've had an opportunity to read this

7 section of Exhibit 24 labeled, "May 27, approximately

8 6:20 a.m., Amanda Grace-Hawkins, Shirley Scales"?

9     A.   Uh-huh.

10     Q.   Yes?

11     A.   Yes.  I've read this.

12     Q.   And the first question is:  You testified

13 earlier that you met with Shirley Scales a second time

14 after the first meeting; do you recall that testimony?

15     A.   Uh-huh.  Uh-huh.  Yes.

16     Q.   And would you agree that this purports to be

17 documentation of that second meeting with Ms. Scales?

18     A.   It purports to be a meeting.  I can't tell

19 you if this was the second one or not.  I mean --

20     Q.   Okay.  Is there anything that you disagree

21 with in that section?

22     A.   I don't recall her asking me to leave early.

23 I really don't.

24     Q.   Okay.  Other than that, do you disagree with

25 any other thing that's written there?

139

1       A.   It says, "Kathy gasped for air ... at the

2   same time ..."

3            Kathy covered her mouth, like, in -- *Oh, my*

4   *gosh*, like in that manner.

5       Q.   Uh-huh.

6       A.   Other than that, that's about pretty

7   accurate.

8       Q.   Okay.  Now, do you recall that Mr. Robinson

9   was suspended from Anheuser-Busch while the

10  investigation was proceeding?

11      A.   I thought, when he left, that was -- they had

12  fired him until the union filed a grievance.  That was

13  during the investigation.  Is that correct?  I mean,

14  I -- other than that, I really don't know.

15      Q.   Okay.  Well, let me just ask you this

16  question:  Do you know if he was suspended prior to his

17  termination?

18      A.   No.

19      Q.   Okay.

20      A.   Only thing I knew is:  He was no longer

21  there.

22      Q.   All right.  That's fair enough.

23           Do you recall either Scott McHugh or Shirley

24  Scales offering to you that you would be able to park

25  in front of the guard building?

FRALEY, COOPER & ASSOCIATES
(800) 852-6163     (614) 228-0018     (740) 345-8556

1   A.   Yes, they did.

2   Q.   Who was that, that talked to you about that?

3   A.   I believe it was Scott McHugh.

4   Q.   And he said that you can park in front of the
5   guard building?

6   A.   Yes, for as long as I wanted to.

7   Q.   Okay.  And when did he tell you that?

8   A.   This was, I believe, after my car got keyed,
9   I believe.

10   Q.   Did he tell you why he was offering to allow
11   you to park in front of the guard building?

12   A.   For safety reasons.  I -- No, it might have
13   been -- it was either after my car got keyed or after
14   Kathy's house was set on fire.  I'm not for sure which
15   one it was, but I know it was for safety reasons.

16   Q.   And did you, in fact, park in front of the
17   guard building?

18   A.   Yes.

19   Q.   Did Scott also offer that guards would escort
20   you to and from your car before and after work?

21   A.   No one ever escorted me.

22   Q.   Well, my question is:  Did Scott --

23   A.   Did he offer?

24   Q.   Yes.

25   A.   I don't recall that.

141

1    Q.   Would you deny that he offered you that if he

2  were to testify that he did?

3    A.   I just don't recall.  He might have.  I don't

4  know.

5    Q.   Did Scott McHugh instruct you to save any

6  voice mails or caller IDs that you might receive from

7  Mr. Robinson?

8    A.   I don't recall that, either.  I don't think

9  so, though.  I don't recall it.

10    Q.   If he were to say that he did make that offer

11  to you, would you deny it?

12    A.   I don't recall.

13    Q.   Did Scott McHugh or anybody else from

14  Anheuser-Busch offer to put you in a hotel?

15    A.   I believe they did.

16    Q.   Okay.  And do you remember when that was?

17    A.   No, I don't, not exactly.

18    Q.   Did Scott McHugh or anyone else from

19  Anheuser-Busch instruct you that they were going to

20  notify the local police to drive by your residence

21  periodically?

22    A.   They said something to that effect but I

23  ended up having 24-hour surveillance.

24    Q.   Do you remember when the 24-hour surveillance

25  began?

1      A.    Not too long after Kathy's house was set on

2  fire.

3      Q.    Were you aware that the company was paying

4  for the 24-hour surveillance?

5      A.    Yes.

6            You know what?  They might have provided --

7  it might have started before Kathy's house got set on

8  fire.  I'm pretty sure it did, yeah.

9      Q.    Okay.

10           Were you ever aware that, when Bill Robinson

11  was informed of your allegations and escorted out of

12  the Brewery, were you aware that guards escorted him

13  out of the Brewery to his car?

14     A.    From my understanding, it was Columbus Police

15  that escorted him out.

16     Q.    Okay.  Certainly, you did not see him on the

17  day he was asked to leave the Brewery?

18     A.    Correct.

19     Q.    Did anybody ever tell you what Bill Robinson

20  said in response to your complaint of harassment?

21     A.    I read a document from Sandy.  That's it.

22     Q.    I'm going to show you documents which are

23  stamped ABI-1305 and 1306, ask you if that's what you

24  read?

25     A.    Yeah, I believe this is what I did read, yes.

1    Q.   This was after the fire?

2    A.   It was a couple weeks, maybe, after the fire.

3 It wasn't right directly after the fire.  Maybe two

4 weeks or something.

5    Q.   Okay.  What did you say, if anything?

6    A.   I told them that if anything happened to my

7 house, my mom or my son, I'd be on every television

8 station that would listen to me.

9    Q.   Now, did the police conduct surveillance on

10 your house on their own; if you know?

11    A.   They said that they would drive by

12 periodically or -- but they were -- the times that I

13 spotted him, they were never around.

14    Q.   And did the union do anything at all to

15 protect --

16    A.   I never heard from the union.

17    Q.   Okay.  So in response to the fire, the

18 company paid for 24-hour surveillance of your house;

19 correct?

20    A.   Correct.

21    Q.   The union did nothing; --

22    A.   Correct.

23    Q.   -- correct?

24    And the police drove by occasionally but did

25 nothing else; correct?

164

```
 1        A.    Correct.

 2        Q.    And it's your recollection that the company

 3  paid for 24-hour surveillance of your house for a

 4  two-week period after the fire?

 5        A.    Total, it was around five weeks, four or five

 6  weeks that they paid for.

 7        Q.    All right.  So there was a two-week period

 8  after the fire; correct?

 9        A.    Approximately.

10        Q.    And then there was approximately a three-week

11  period of 24-hour surveillance before the fire and

12  after Mr. Robinson had been terminated?

13        A.    That's correct.

14        Q.    And, again, the union did nothing?

15        A.    Correct.

16        Q.    And the best that the police would do is

17  drive by occasionally?

18        A.    Drive by, unless they were called.

19        Q.    When was the first time that you met Shakey

20  Harris?

21        A.    I met Shakey Harris, I believe, after -- it

22  was when everybody else did.  We met him at a hotel

23  near Anheuser-Busch and they brought some -- I think it

24  was some corporate security guys were here; --

25        Q.    When you say "they brought" --
```

1    Q.   How many times did you talk to him on the

2  phone?

3    A.   A couple.

4    Q.   Did you ever talk to John Burke again?

5    A.   I don't recall.

6    Q.   So what happened next?

7    A.   After the meeting with Shakey?

8    Q.   Yes.

9    A.   When I left, they were trying to get as much

10  information as they could on William.

11    Q.   Were you ever interviewed by a police officer

12  about William Robinson?

13    A.   What police officer?

14    Q.   Any police officer.

15    A.   Besides the Stalking Unit?

16    Q.   (Affirmative nodding of head.)

17    A.   Not "interviewed." Talked of, yes. Talked

18  to another police officer but not interviewed, I don't

19  think so.

20    Q.   Okay. Do you recall that the fire at

21  Jackson's house was July 29, 2003?

22    A.   I didn't know the exact date. I know it was

23  a week or so after the Multi-Plant decision.

24    Q.   You have no reason to dispute that the fire

25  was July 29, 2003?

1      A.   No, I don't.

2      Q.   Are you aware that Anheuser-Busch offered a

3 $25,000 reward to encourage witness participation in

4 the investigation of the fire at Ms. Jackson's home?

5      A.   Yeah, I think so.  I heard that.

6      Q.   Okay.

7          Did the union offer any money as a reward?

8      A.   Not that I know of.

9      Q.   When did you first learn -- Let me rephrase

10 that.

11          So what happens next after the fire, with

12 respect to William Robinson?

13      A.   I really don't know.  He was on the loose.

14 Like I said, I saw him in my subdivision on the way to

15 work that night.  I went to the Stalking Unit the next

16 morning, talked to Special Duty Officer Lieutenant

17 Springer, which Scott McHugh referred me to.  After

18 that, (negative shaking of head) ....

19      Q.   Now, eventually, you learned that it was

20 alleged that Mr. Robinson had shot Kieana Shelton?

21      A.   Yes, I did.

22      Q.   When did you first learn of that?

23      A.   About three hours after it happened.

24      Q.   Okay.

25      A.   Amy Baucum called me.  Anheuser-Busch didn't.

```
1        Q.    And that was October 23, 2003?

2        A.    I believe so.

3        Q.    And what did Amy say?

4        A.    "Get out of your house.  Bill shot Kieana and

5   they don't know where he is."

6        Q.    And what did you do?

7        A.    I had to, like, pinch myself first.  I mean,

8   I was very upset.  I didn't know what to do.  I

9   started, like, gathering stuff to -- to get out of the

10  house, to get my son and get out of there.  My mom was

11  with me, too.

12       Q.    So what did you do?

13       A.    I made some phone calls to see where I could

14  go.  Was debating whether a hotel or a family member's

15  house.  I was going crazy.  I didn't know what to do.

16       Q.    Speaking of a hotel, Anheuser-Busch had

17  offered to put you up in a hotel during this time

18  period; correct?

19       A.    Early on.

20       Q.    After the fire?

21       A.    I think it was after the fire, yeah.

22       Q.    Okay.

23       A.    But that had nothing to do with this.

24       Q.    And Anheuser-Busch offered to pay for your

25  hotel stay?
```

1    A.    I think so.  I think they did.

2    Q.    So you learned from Amy Baucum about this

3    incident on October 23, 2003.  You make some phone

4    calls.  What happens next?

5    A.    I called -- I did call Anheuser-Busch and I

6    left a message, I believe, and then I got a call from

7    the Stalking Unit telling me to get out of my house and

8    told me to go somewhere where, you know, no one could

9    find me and all this, and so I was gathering things.

10   Me and my mom were running around.  And before we could

11   get out -- get out the house -- Oh, I called Blendon

12   Township Police to the house, too.  Before we could get

13   out, I got another call from the Stalking Unit and said

14   that he had killed hisself.

15   Q.    When you called Anheuser-Busch, did you speak

16   with anybody?

17   A.    I think I just left a message.

18   Q.    Okay.

19   A.    I mean, I was making random calls, just

20   sporadic, you know.

21   Q.    And who called you to let you know that Bill

22   Robinson had killed himself?

23   A.    Someone in the Stalking Unit.

24   Q.    So what did you do after you learned that

25   news?

188

1     Q.    Have you and she talked about this case?

2     A.    Yes.

3     Q.    What have you said to each other?

4     A.    We talked about mostly how we were being

5 treated at Anheuser-Busch, how we were shunned.  A lot

6 of people stopped speaking to us.  Sometimes, they

7 would turn their back when you're walking up, just so

8 they wouldn't have to speak.  Things of that nature.

9     Q.    And who stopped talking to you?

10    A.    Employees.

11    Q.    Such as ...?

12    A.    There's a lot of employees.  I mean, people

13 just in by-passing that you used to wave and say hello,

14 they wouldn't speak.

15    Q.    Are you talking about hourly employees?

16    A.    Yes.

17    Q.    Okay.

18     By the way, you still hold the same position

19 at Anheuser-Busch now that you held before May 16,

20 2003; correct?

21    A.    Title never changed, that's correct.  If

22 you're in packaging and -- brewing and -- packaging --

23 bottling, shipping and packaging, you are a Production

24 Associate, I don't care where they put you.

25    Q.    And so you haven't been demoted?

1    A.   No.

2    Q.   You were never suspended after May 16, 2003?

3    A.   No.

4    Q.   The only transfer that occurred was from the

5    midnight shift to the day shift; correct?

6    A.   Yes.

7    Q.   And that was at your request?

8    A.   That's correct.

9    Q.   Your rate of pay is controlled by the union

10   contract; --

11   A.   That's correct.

12   Q.   -- is that correct?

13   A.   (Affirmative nodding of head.)

14   Q.   And you are paid whatever the contract says

15   you should be paid; correct?

16   A.   Correct.

17   Q.   So you lost no money as a result of your

18   complaint about Bill Robinson -- Correct? -- no wages?

19   A.   No wages.

20   Q.   Have you been disciplined since May 16, 2003?

21   A.   Yes.

22   Q.   For what?

23   A.   A verbal reprimand for absenteeism.

24   Q.   Were you, in fact, absent?

25   A.   I was absent.

1      Q.   Did you grieve that verbal reprimand?

2      A.   I -- yes, I wanted to grieve it.  I heard

3  nothing else about it and then I ended up going to day

4  shift, but it was a discrepancy of what showed on

5  Anheuser's computers that was available, the day was

6  available, and then I took the day and then they said

7  it was not available.

8      Q.   Were you suspended as a result of that

9  discipline?

10      A.   No, it was a verbal.

11      Q.   Have you received any other discipline since

12  May 16, 2003?

13      A.   No.

14      Q.   Referring back to Exhibit 30, who is Joe?

15      A.   I don't know Joe's last name.  He's an AB

16  employee and he is a military reserve.

17      Q.   What does he know about this case, if

18  anything?

19      A.   He was around or worked with Jackie

20  Cunningham when she was having problems with Bill --

21  with William Robinson, rather.

22      Q.   Who is Bob Theisen?

23      A.   Bob Theisen worked on Line 75.

24      Q.   And what, if anything, does he know about

25  this case?

```
 1              MR. KNUEVE:  Okay.  Can we go off the record.
 2              (Discussion off the record.)
 3   BY MR. KNUEVE:
 4       Q.   Back on the record.
 5              Ms. Grace-Hawkins, I take it you are not
 6   alleging a claim of retaliation against Anheuser-Busch?
 7       A.   No.  Just stalking.
 8       Q.   Okay.
 9              MR. KNUEVE:  Can I get that one marked,
10   please.
11                       - - -
12              A COPY OF A CHECK FROM AMANDA M.
13              GRACE-HAWKINS TO BILL ROBINSON,
14              DATED 4/28/02, FOR $80.00, CHECK
15              NO. 640 WAS MARKED AS EXHIBIT 31.
16                       - - -
17   BY MR. KNUEVE:
18       Q.   Ms. Grace-Hawkins, the court reporter has
19   handed you what's been marked as Exhibit 31, which was
20   a document that you produced today.  Can you identify
21   that exhibit, please?
22       A.   Yes, this is the check that I wrote to Bill
23   Robinson for the lights.  Looks like I put the wrong
24   year on it; I've got 2002, it was 2003.
25       Q.   And Mr. Robinson never cashed that check; is
```

 *Anheuser-Busch, Inc.*



October 16, 1996


Amanda Grace
264 Highmeadow Drive
Gahanna, OH 43230


Dear Amanda:

We are pleased to confirm our offer to you regarding a position as a Weekend Relief
Production Operator at the Columbus Brewery. Your starting rate of pay will be $20.14
per hour.

The starting date of your employment will be Monday, November 4, 1996. Please report
to 700 Schrock Road (Administration Building) at 3:30 p.m. on this date to complete the
necessary documents and begin training. Please note that I have enclosed a Federal Form
I-9. The information on this form is now required by Federal law before you can begin
work. When you report on your first day, please bring the form with Section 1
completed, and one document from lists A or one document from both list B and C.
Compliance is required before you can begin work.

If you have any questions in regard to this, do not hesitate to call the Human Resources
Office at (614) 847-6246. We believe you will make a positive contribution to Anheuser-
Busch, Inc. and look forward to you joining the "Great American Beer Company".

Sincerely,

*Elaine Gaunt*

Elaine R. Gaunt
Personnel Specialist
Human Resources


Enclosure

cc:    D. Brown
       R. Sambecki
       R. Bickel


ABI-000272



*Anheuser-Busch, Inc.*
ONE OF THE ANHEUSER-BUSCH COMPANIES

EXHIBIT
9

May 4, 1999

Ms. Amanda Grace
5010 Cherrybluff Ct.
Gahanna, OH 43230

Dear Amanda:

This is to confirm our offer and your verbal acceptance of an Apprentice position with Anheuser-Busch, Inc. Columbus Brewery. Based on the Company's implemented terms of employment, the probationary period is six (6) months. Thereafter for the next eighteen (18) months, you will be in the Apprentice program. The current hourly rate is $15.04 or seventy (70%) percent of the contractual production rate of pay for the first six (6) months of work, seventy five (75%) percent of the contractual production rate of pay for the second six (6) months, and 85% of the contractual production rate for the second year.

Anheuser-Busch, Inc. offers a comprehensive benefits package. A summary of this package is shown below, but is subject to change from time to time as a result of negotiated modifications to the collective bargaining agreement and other circumstances.

1.  Vacation:
    One week vacation after one year of service
    Two weeks vacation after two years of service
    Three weeks vacation after three years of service
    Four weeks vacation after five years of service
    Five weeks vacation after eight years of service
    Six weeks vacation after ten years of service

2.  A life insurance, hospitalization, dental and vision care plan which becomes effective on your first day of employment.

3.  A defined benefit pension plan. The current contribution rate is $3.254 contributed per hour worked; maximum of forty (40) hours a week. Contributions begin on your first day of employment.

ABI-000264

4.    Sick leave with pay earned at the rate of three (3) days during the first twelve months of employment.

5.    The Anheuser-Busch Deferred Income Stock purchase and Savings Plan 401(k) after achieving minimum service requirements.

6.    Fifteen (15) holidays will be observed per calendar year.

7.    Three (3) days of paid Bereavement Leave will be provided for a death in the immediate family.

8.    Jury duty will be paid as the difference between the straight time day shift rate and jury pay.

9.    Twelve (12) Busch Garden tickets are available per calendar year for use by you and your immediate family.

10.   Two (2) cases of beer are available per month.

Your first day will be Monday, May 17, 1999.  Please report to the Administration Building at 3:00 p.m.  We are looking forward to welcoming you to the Columbus Team.  If you have any questions, please do not hesitate to contact me at (614)847-6246.

Sincerely,

Elaine Gaunt

Elaine R. Gaunt
Human Resources
Specialist

hr-dept\offerapp.doc

ABI-000265

# PLANT AGREEMENT

### Between

## ANHEUSER-BUSCH, INC.
## COLUMBUS, OHIO

### and

## THE BREWERY AND SOFT DRINK
## WORKERS CONFERENCE,
## U.S.A. AND CANADA

### and

## LOCAL UNION 284

Affiliated With The
International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and
Helpers of America

March 1, 1998 - February, 2004

A B I - 0 0 1 3 2 7



EXHIBIT

/2



| ARTICLE | TABLE OF CONTENTS | PAGE |
|---|---|---|
| 1 | Recognition Clause | 7 |
| 2 | Union Security | 8 |
| 3 | Seniority | 9 |
| 4 | Leave of Absence | 12 |
| 5 | Disciplinary Action | 14 |
| 6 | Shop Stewards | 15 |
| 7 | Business Agents and Union Officials | 16 |
| 8 | Grievance Procedure | 17 |
| 9 | Wages | 20 |
| 10 | Workweek, Workday, Overtime | 23 |
| 11 | Vacation | 33 |
| 12 | Holidays | 35 |
| 13 | Rest Periods | 37 |
| 14 | Payment for Time Lost for Medical Attention Related to Injury Arising Out of Employment | 37 |
| 15 | Going from Hot to Cold Temperature | 38 |
| 16 | Safety Equipment and Clothing | 38 |
| 17 | Hand Stacking of Full Half Barrels | 41 |
| 18 | Installation of New Machinery-Changes in Production Methods and/or Devices | 41 |
| 19 | Bulletin Boards | 42 |
| 20 | Emergency | 42 |

ABI-001328

ARTICLE       PAGE

21    Performance of Bargaining Unit Work ............................... 42

22    Employee Taken Away from Assigned Work ..................... 44

23    Shift Preference ................................................................. 44

24    Inter-Departmental Transfers ........................................... 44

25    Non-Discrimination - Union .............................................. 45

26    Non-Discrimination - Race ................................................ 45

27    Disciplinary Transfers ....................................................... 45

28    Physical Examinations ....................................................... 45

29    Bereavement Leave ........................................................... 46

30    Jury Duty Pay .................................................................... 46

31    Welfare .............................................................................. 47

32    Pension .............................................................................. 49

33    Strike - Lockouts .............................................................. 52

34    Struck - Picketed ............................................................. 52

35    Sub-Contracting ................................................................ 52

     Letter of Intent and Clarification Of Article 35-
     "Subcontracting" .............................................................. 53

36    Sick Leave ........................................................................ 55

37    Labor-Management Committee for Excellence ................. 56

38    Past Practices .................................................................... 61

39    Local Brewery Supplemental Agreements ....................... 62

40    Other Contract Matters .................................................... 62

41    Supplemental Unemployment Fund ................................. 62

42    Anheuser-Busch Deferred Income Stock Purchase
     and Savings Plan ............................................................... 63

43    Employee Job Security ...................................................... 63

44    Enhanced Retirement & SUB Contributions .................... 67

45    Drug Testing ..................................................................... 69

46    Duration ............................................................................ 71

Addendum

#1    Absence and Tardiness Policy ........................................... 73

#2    QA Memo of Understanding ............................................ 74

#3    Monday Holiday - Week Following Vacation ................... 75

#4    Training - Shift Preference ............................................... 76

#5    Severance Benefits ........................................................... 77

#6    QA Departments ............................................................... 78

#7    Inter-Departmental Transfer ........................................... 84

#8    Floating Holiday ............................................................... 85

#9    Summer Vacation ............................................................. 86

#10   Beer Eligibility ................................................................. 87

#11   Overtime Charging ........................................................... 88

#12   Apprentices, Seasonals, Weekenders .............................. 89

#13   Memo of Understanding - Beer Consumption ................. 95

ABI-001329

3

ABI-001330



#14  Joint Health Care Task Force ....... ...... ............ ......... 97

#15  Maintenance Subcontracting Memo of
     Understanding - Exception List .... ...... ............. ............ 98

#16  Commitment to Keep the Breweries Open..... ............ 102

## Clarifications

The Clarifications set forth within the applicable provisions of this agreement were written with the understanding that both the Company and the Union would be able to use them in connection with any issues with respect to the specific provisions they address.  We also believe it is important that our employees should have access to these clarifications so that they may understand the intent and interpretation of those provisions. Therefore, the clarifications are incorporated into the applicable contract provisions with the understanding that, although not part of the contract language itself, these clarifications are the Company's effort to clear up any misunderstandings as to the meaning and interpretations of the proposed contract language contained in the Company's March 28, 1998 final offer and subsequently ratified by the Union.

ABI-001331

ABI-001332

5

6

The Company shall pay the Health and Welfare and Pension Fund contributions of employees on leave of absence for training in the military reserves or National Guard, but not to exceed four (4) calendar weeks, provided such absence affects his credits or coverage for Health and Welfare and/or Pension.

In the event an employee is required to report into the National Guard or reserve unit for active duty due to some emergency, the employee will be entitled to the difference in wages and Health and Welfare and Pension contributions provided above, for an additional two (2) calendar weeks in that calendar year.

Section 4. Maternity Leave. Maternity Leave shall be governed by applicable law.

Section 5. Educational Leave. With the approval of the Union, an employee with one (1) year or more of seniority, at the discretion of the Company, may be granted a leave of absence to further his education as a full time student in a course of study leading to a degree or at a recognized trade school which is job related. The length of the leave shall not exceed the amount of seniority of the employee or four (4) years, whichever is the shorter. Verification that the employee on leave is continuing his educational program can be required by the Company or the Union.

Section 6. Medical Leave. An employee who is unable to work due to a bonafide non-occupational illness or injury may apply for medical leave. The application for leave will specify the medical condition for which leave is requested and will be accompanied by a statement from the employee's physician with respect to the employee's inability to work and the expected date of return to work. The initial leave will be granted for the period of time specified by the physician, in writing, and may be extended in the event additional time is required, in the same manner as the request for the initial leave. The total length of leave, including the initial leave and extensions shall not exceed twenty-four (24) months.

Medical Leaves of Absence which are not qualified under the Family and Medical Leave Act may be granted for periods of less than five (5) days (subject to the application/certification procedures established by the Company). A bonafide medical leave, whether for more or less than five days, shall not count against an employee for the purposes of a Brewery's Attendance and Tardiness Policy and shall be considered a Qualified Absence for the purposes of eligibility for work and premium pay on weekends and holidays. However, the Company retains its right to establish application/certification procedures for Medical LOA's. The Company will not tolerate abuse of Medical Leaves by employees or their physicians. Therefore, in order to prevent abuse of such leaves and to ensure that Medical Leaves are only granted for serious and legitimate medical problems, the Company may, as an element of its certification procedures, require verification of the need for and length of a medical leave by a Company-designated physician.

Section 7. Family and Medical Leave Act.

The Company and the Union agree to comply with the Family and Medical Leave Act of 1993 (FMLA) as it may be amended from time to time. The parties further agree that the Company reserves all rights and privileges granted to it under the FMLA.

ABI-001339

13

Any dispute concerning the interpretation or application of the FMLA shall be subject to the terms of the grievance and arbitration procedure, the last step of which is final and binding arbitration. (CLARIFICATION: This provision on the Family and Medical Leave Act (FMLA) is intended, in part, to reinforce the commitment of the Company that, in most cases, the best method for resolving disputes in the workplace is through the agreed-upon grievance and arbitration procedure. There are, however, still unresolved legal issues regarding access to the courts or other administrative procedures for issues arising under the FMLA and whether an employee can, in all cases, be compelled to resort to the grievance and arbitration procedure in connection with such issues. Although the Company will maintain its position that employees are bound by the grievance and arbitration procedure to resolve any FMLA disputes, the Company understands that the Union may still contend in a future dispute that employees need not exhaust the grievance and arbitration procedure before resorting to litigation or administrative procedures to resolve FMLA issues.)

ARTICLE 5

DISCIPLINARY ACTION

Section 1. Discharge and Discipline. The right of the Company to discharge, suspend, or otherwise discipline in a fair and impartial manner for just and sufficient cause is hereby acknowledged. With the exception of absence or tardiness issues, notice of the possibility of disciplinary action shall be given to the employee or, in the employee's absence, to the steward within five (5) working days after the Company has knowledge of the alleged infraction or of the employee's involvement. Whenever an employee is discharged, suspended, or otherwise disciplined, the Union and the employee shall promptly be notified in writing of such discharge, suspension, or other disciplinary action and the reason therefor. No discipline, written notice of which has not been given to the Union and the employee, nor any discipline which has been given more than twenty-four (24) months prior to the current act, shall be considered by the Company in any subsequent discharge, suspension, or other disciplinary action. If an employee is suspended or discharged, he shall be allowed to complete his regular shift or be paid for the balance of such shift. For purposes of implementing this twenty-four (24) month period beginning with the 1998 agreement, discipline prior to July 1, 1997 shall not be considered by the Company in those breweries which had been subject to the nine (9) month discipline period; as to Local 1187, discipline prior to October 1, 1996 shall not be considered by the Company in connection with discipline other than discharge or for absenteeism. (CLARIFICATION: This provision provides for implementation of the 24-month look-back period as of April 1, 1998 in the affected locations. However, with respect to initiation of the twenty-four month look-back period, the Company will not consider any prior discipline which no longer would have been considered under the prior look-back period. For example, if an employee under the nine-month look-back period had discipline on his record from June, 1997, that discipline could no longer then be considered as of April, 1998. Even though the Company will implement the 24-month look-back period as of April 1, 1998, the June

ABI-001340

14



whose work is covered by this Agreement are employed therein, upon notification to the Company or the Company's authorized Representative of his intended presence on the premises. The Company shall at all times have on the premises an authorized representative to accept the required notification.

## ARTICLE 8

### GRIEVANCE PROCEDURE

Section 1. DEFINITION. A grievance within the meaning of this procedure shall be defined as any difference between the Company and the employee covered by this Agreement or between the Company and the Union as to the following:

    (a) Any matter relating to wages, hours of work, or working conditions covered by this Agreement; or

    (b) Any matter involving the meaning, interpretation, application or alleged violation of this Agreement by the Company.

    The Company and the Union must resort to the use of the grievance and arbitration procedure established herein; provided, however, that this shall not be construed as requiring the originator to process a grievance which he considers as having insufficient or no merit.

Section 2. GRIEVANCE PROCEDURE. Prior to the institution of any grievance, any employee who believes he has suffered a grievance, must, with the assistance of a steward, attempt to resolve the matter with his supervisor. The supervisor has the responsibility and the authority to resolve the employee's grievance. The steward has the responsibility and the authority to settle, withdraw or refer the grievance to the further steps of the grievance procedure. It is specifically understood that the disposition of grievances at this informal level of the grievance procedure shall in no way constitute a precedent regarding the disposition of future grievances and disposition of grievances at this informal level shall be without prejudice to the position of either the Company or the Union.

    STEP 1. Any grievance which remains unresolved following the informal discussion referred to in the preceding paragraph may be referred by the steward to the department head or his designated representative for adjustment within five (5) working days after the occurrence of the event giving rise to the grievance. The representative of management shall give an oral reply within two (2) working days after submission of the grievance. Grievances concerning employees in more than one department, or general Union grievances, may be presented in writing under Step 2 without proceeding through Step 1.

    STEP 2. If the grievance is not adjusted under Step 1, then within four (4) working days after the Company's Step 1 reply, the grievance shall be submitted in writing to the Manager of Human Resources.

    The written grievance shall set forth the specific provisions of the Agreement alleged to be violated. At a mutually agreed-upon time, but not later than seven (7) working days after the written grievance is submitted, the Management-Designated Representative and the Business Representative of the Union or his/her designee shall meet to discuss the written grievance. The Management-Designated Representative shall give the Company's written Step 2 answer to the written grievance within four (4) working days from such meeting.

    Within seven (7) working days after receipt of the Company's written Step 2 answer, the Union shall advise the Company that the Company's Step 2 answer is acceptable or that the grievance is appealed to the Multi-Plant Grievance Committee. Thereafter, if the grievance is not resolved, the Union and the Company shall meet and prepare the M.P.G.C. form which will include the facts which are not in dispute. Representatives of the Company and the Union shall reasonably be available to each other during office hours to complete this form. The form shall be presented with the parties' position statements to M.P.G.C.

    Appeals of Oral and Written Reprimands shall be excluded from the jurisdiction of the M.P.G.C. If a reprimand is settled at the local level, it may not later be appealed to the M.P.G.C. in connection with a subsequent suspension or discharge and it shall be considered by the M.P.G.C. as part of the employee's record if it was issued within the time limits for considering prior discipline. If a reprimand is not agreed to at the local level, it shall be reviewed by the M.P.G.C. in conjunction with a subsequent suspension or discharge which is based in part on the issuance of the reprimand. In such a case, the review of the reprimand shall be heard together with the suspension or discharge. A reprimand which is upheld by the M.P.G.C. upon review in conjunction with a subsequent suspension or discharge shall be considered by the M.P.G.C. in assessing the appropriate level of discipline in the suspension or discharge arbitration.

    STEP 3. Grievances appealed by the Union from Step 2 shall be decided by the Multi-Plant Grievance Committee. Decisions of the M.P.G.C. shall be made by unit vote, management representatives casting one vote and the union representatives casting one vote. Decisions of the M.P.G.C. shall be final and binding on all parties with no further appeal.

    The M.P.G.C. shall consist of two representatives of the Company, at least one of whom shall be a representative of Anheuser-Busch Companies, Inc corporate management and one representative who may be a representative of Anheuser-Busch, Inc. corporate management or a brewery Human Resources Manager or his assistant, and two representatives of the Union, at least one of whom shall be a representative of the Brewery and Soft Drink Workers Conference, and one representative who may be a Business Agent servicing a covered plant or, in the event he is unavailable, his alternate (a full time employee of the Local Union or a designated officer thereof). Plant and Local Union representatives shall not serve on the M.P.G.C. panel where the M.P.G.C. is considering a grievance from the local representative's plant. Each party shall designate one of its representatives to act in the capacity of co-secretary to the M.P.G.C.

ABI-001343

17

ABI-001344

18



The parties shall appoint a neutral who shall be a member of the M.P.G.C. panel. The neutral shall preside over the M.P.G.C. hearings and the Executive Sessions. In the event that the representatives of the Company and the Union deadlock on the matter presented, the neutral shall decide the case. Every M.P.G.C. decision shall be authenticated by the signature of the neutral. Rather than recalling the parties for an announcement of the decision, such decision in each case will be simultaneously faxed to the parties.

The neutral shall be selected by the parties on an annual basis. If the parties cannot agree on a neutral, they shall jointly request from the American Arbitration Association, a list identifying ten qualified arbitrators. The parties shall meet and mutually select the neutral from the AAA list as expeditiously as possible. In the event that the parties cannot agree to a neutral from the first AAA panel, they shall jointly request another panel from the AAA and continue with this process until a neutral is mutually selected. The cost of the M.P.G.C. including the selection, compensation, and expenses of the neutral shall be divided equally between the parties unless otherwise noted below.

Section 3. M.P.G.C. PROCEDURES

The Company and Union representatives of the M.P.G.C. shall formulate rules of procedure to govern the conduct of the M.P.G.C. proceedings.

(a) The grievance shall be docketed on the date the Union appeals the grievance to the M.P.G.C. The fee is incurred on the date of the docketing of the case. The parties shall each pay $200.00 as their fee in suspension and discharge cases ($250.00 during the last full year of this contract term). The fee shall be $500.00 for all other cases, to be paid in its entirety by the party which is determined by the panel, or by the neutral in the event the representatives of the Company and the Union are deadlocked, to be the losing party considering the overall scope of the case.

(b) In the event the panel is unable to hear all the cases docketed, the panel is authorized to schedule a continuance before the next scheduled M.P.G.C. session to adjudicate the outstanding cases.

(c) The Union and the Company shall exchange position statements seven (7) days prior to the first day of the next M.P.G.C. meeting date. Position statements for cases involving subcontracting may be exchanged as late as five (5) days prior to the first day of the next M.P.G.C. meeting.

(d) Rebuttals and any supporting rebuttal evidence shall be exchanged within two (2) working days after the exchange of the parties' position statements.

(e) The M.P.G.C., or the neutral in the event of a deadlock, may determine that one party has in bad faith abused the grievance procedure by failing to resolve the grievance at a lower level of the grievance procedure or by failing to comply with the Hearing Procedures and Rules of Conduct established by the M.P.G.C. In such a case, the offending party shall be required to pay the M.P.G.C. fees of both parties in cases appealing a suspension or discharge, or two time the fee in all other cases. (CLARIFICATION: The bad faith standard has been in place in the contract for years, and it will remain the same as it has in the past. The double fee penalty is the same as the former penalty where a party acting in bad faith could have been required to pay the fees of both parties, which was the same as a double fee. This penalty may be assessed, just as previously, against the Company, not just against the Union, if the neutral concludes that the Company has abused the process in bad faith or that it has, in bad faith, failed to resolve a case at the local level.)

Section 4. TIME LIMITS. It is agreed that time is of the essence under this Article, and if any time limit set forth in this Article is not complied with, the grievance will be automatically decided against the party who fails to comply with such time limits unless an extension of time is mutually agreed upon in writing prior to the expiration of such a time limit. For purposes of this Article, the term "working days" shall mean days that fall within the period beginning Monday and ending Friday, excluding contractual holidays.

(CLARIFICATION: The parties have agreed to undertake a training program in connection with the grievance and arbitration procedure to improve the effectiveness of the system. This training will be designed to encourage resolution of as many issues as possible at the local level and to help ensure that only significant issues are brought, in good faith, before the MPGC. The parties also have agreed that funds in the MPGC account not needed for administration of the MPGC will be available for these training programs and also for computerized information management of MPGC cases and data.)

Section 5. PAYMENTS. In settlement of grievances, checks will be made within seven (7) days of settlement of the grievance.

Section 6. RULES OF CONDUCT. The parties recognize that reasonable rules of conduct are necessary to the smooth and efficient operation of the breweries and to ensure fair treatment of employees. The parties also recognize that employees and Union representatives have substantial knowledge and experience, and it is of value to the Company to solicit their input and suggestions before issuing new or changed rules or regulations. Therefore, the Company will not issue any new or amended rules without first giving the Union an opportunity to consider such rules and to comment on them

ARTICLE 9

WAGES

Section 1. The following wage rates shall be paid.

ABI-001345

19

ABI-001346

20






/3



# WORKPLACE HARASSMENT

## POLICY

Harassment in the workplace is a violation of the law and a form of employee misconduct that Anheuser-Busch strongly disapproves of and does not tolerate. The Company is committed to maintaining a work environment free of any type of harassment. This refers not only to sexual harassment, but also to harassment based on age, race, color, religion, national origin, sexual orientation, disability or veteran's status.

The Company expressly prohibits unwelcome sexual advances or requests or demands for sexual favors, or other verbal, physical or visual conduct based on gender when submission to or rejection of such conduct is a basis for employment decisions, or when such conduct creates a hostile or offensive working environment. The Company also prohibits any type of conduct that degrades, insults or is offensive to a person based on his or her race, gender, national origin, sexual orientation, age disability, religion, or any other characteristic protected under Equal Employment Opportunity law.

Examples of offensive or inappropriate conduct include, but are not limited to: pressure for dates or sex in exchange for a job benefit or continued employment; lewd or sexually suggestive comments; sexual jokes; innuendoes; leers; unwelcome flirtations; inappropriate touching; any display of sexually explicit or otherwise offensive pictures or objects; and any other behavior that may contribute to a hostile work environment such as verbal, physical or written communication directed at a person or persons because of their race, gender, color, religion, national origin, sexual orientation, disability or veteran's status.

Anyone who violates this policy will be subject to disciplinary action up to and including termination. Any manager or supervisor who becomes aware of conduct which may constitute harassment and fails to report the matter pursuant to this policy will be subject to disciplinary action, up to an including termination. Any form or harassment by a temporary, contractor, vendor, or other "non-employee" should also be reported pursuant to the procedures below.

## COMPLAINT PROCEDURE

Page 1

ABI-001204

I.   Any employee who has a complaint of workplace harassment or who is aware of conduct which may constitute workplace harassment should immediately report the problem to his/her supervisor, to the head of his/her department, or to the local human resources manager. In addition, complaints of workplace harassment may be reported to Personnel Communications at 1-800-325-9393.

II.  Complaints of workplace harassment will be promptly investigated and will be handled to the extent possible, in a confidential manner. If it is determined that an employee has violated this policy, appropriate disciplinary action, up to and including termination, will be taken against the offending employee. The employee making the complaint and the employee accused will be informed of the results of the investigation.

III. Retaliation is unlawful and the Company will not tolerate any form of retaliation against an employee for making a complaint under this policy or for assisting in an investigation of a complaint. Any employee who has so retaliated will be subject to appropriate disciplinary action up to and including termination. In addition, anyone found to have made a bad faith complaint or given false information will also be subject to disciplinary action.

ADMINISTRATION

All questions regarding the interpretation and administration of this policy should be directed to the local human resources manager or to the Director, Compliance Department, Human Resources.

ABI-001205